**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| SUPERIOR PERFORMERS, INC. d/b/a NATIONAL AGENTS ALLIANCE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:15CV134 |
| RYAN J. PHELPS and BRIDGET M. PHELPS, | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a Motion to Dismiss Plaintiff's Amended Complaint ("Motion" or "Motion to Dismiss") filed by Defendants Ryan J. Phelps ("Mr. Phelps") and Bridget M. Phelps ("Ms. Phelps") (collectively referred to as "Defendants") [Doc. #23]. Specifically, Defendants move to dismiss each claim alleged in the Amended Complaint [Doc. #21] – the first and second claims for breach of contract, the third claim for tortious interference with business relations, and the fourth claim for a violation of North Carolina General Statutes § 75-1.1 et seq.[1] The

---

[1] In their Motion, Defendants also move to dismiss a claim for a violation of North Carolina General Statute § 66-152 et seq., North Carolina's Trade Secrets Protection Act. [Doc. #23 at 2.] However, there is no such claim in the Amended Complaint, and Defendants do not argue for its dismissal in their brief in support of their Motion.

parties have fully briefed the Motion,[2] and it is ripe for review.  For the

reasons that follow, Defendants' Motion is granted in part and denied in

part.

I.

Plaintiff Superior Performers, Inc. d/b/a National Agents Alliance

("NAA") is a Virginia corporation with its principal place of business in

Alamance County, North Carolina. (Am. Compl. ¶ 1 [Doc. #21].)  It is an

Independent Marketing Organization ("IMO") and Managing General Agent

("MGA") to various insurance companies ("Carriers"). (Id. ¶ 4.)  As such, it

recruits, screens, and trains independent contractors to sell insurance for

those Carriers. (Id. ¶ 5.)

Defendants, alleged residents of Texas at the time the Amended

Complaint was filed, contracted with NAA and the Carriers to sell life

_____

[2] Over the course of approximately three pages of their sixteen-page Brief in
Support of [Defendants'] Motion to Dismiss Plaintiff's Amended Complaint,
Defendants purportedly present the "Nature of the Matter Before the Court."
[See Doc. #24 at 1-4.]  However, Defendants have not presented the Nature
of the Matter Before the Court as Local Rule 7.2(a) instructs.
Instead, Defendants use this section to describe their understanding of
NAA's business, the role of independent contractors like Defendants, and
the fallacies of NAA's instant action against Defendants.  Defendants have
not cited to any Docket Entry or any other portion of the record in this
matter in support of any statement made in the section they erroneously
labeled "Nature of the Matter Before the Court."  Therefore, such
information has not been considered as part of Defendants' argument in
support of their Motion.

insurance products. (Id. ¶¶ 2, 6.)  The Carriers paid Defendants sales commissions, and NAA earned commissions from Defendants' sales. (Id. ¶ 6.)  As part of his work, Mr. Phelps entered into several contracts with NAA, including Agent Agreements on March 4, 2013 and October 31, 2013 (Am. Compl. Exs. A, C). (Am. Compl. ¶ 7.a., 7.c.)  Ms. Phelps entered into numerous contracts with NAA, including Agent Agreements on May 31, 2012 and February 21, 2014 (Am. Compl. Exs. H, L) and Management Marketing Agreements on September 25, 2012 and September 25, 2013 (Am. Compl. Exs. J, K). (Am. Compl. ¶ 8.e, 8.g-8.i.)  Ms. Phelps also signed a Secured Promissory Note on March 28, 2012 (Am. Compl. Ex. G). (Am. Compl. ¶ 8.d.)

In November 2014, NAA terminated its relationship with Defendants. (Id. ¶ 13.)  Allegedly, Defendants continued to represent themselves as authorized agents of the Carriers after their positions with the Carriers had terminated. (Id. ¶ 14.)  NAA alleges that Defendants violated their contracts with NAA when they solicited sales to NAA's customers; used NAA's confidential information, including NAA's sales leads, customer identities, and customers' insurance needs, and proprietary information to offer and sell insurance products; and competed against NAA in the same geographic territory in which Defendants offered insurance products while associated

3

with NAA. (Id. ¶ 15.)  Defendants allegedly also contacted then-current NAA customers, thirteen of whom are identified in the Amended Complaint, and made false representations that Defendants were still the customers' agents, that Defendants were still NAA agents, and that if another person called claiming to be an NAA agent, it was a scam. (Id. ¶¶ 16, 17.)  NAA alleges that numerous of its customers have terminated their relationships with NAA and its Carriers as a result of Defendants' actions. (Id. ¶ 23.)  In addition, NAA alleges that Defendants have failed to pay debts they owe to NAA, including Ms. Phelps' obligations under the terms of her Promissory Note. (Id. ¶¶ 30, 31.)

The instant action followed.  NAA has alleged breach of contract against Mr. Phelps (first claim), breach of contract against Ms. Phelps (second claim), tortious interference with business relations against both Defendants (third claim), and a violation of North Carolina General Statutes § 75-1.1 et seq., North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") against both Defendants (fourth claim).  Defendants have moved to dismiss each claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

4

II.

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id., 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S. Ct. at 1965); see also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). When evaluating whether the complaint states a claim that is plausible on its face, the facts are construed in the light most favorable to the plaintiff and all reasonable inferences are drawn in its favor. U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014). Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the elements of a cause

5

of action[,]" and "naked assertions . . . without some further factual enhancement" are insufficient. Twombly, 550 U.S. at 557, 127 S. Ct. at 1966; see also Massey, 759 F.3d at 353 (noting that the Court is not obligated to accept allegations that are "'unwarranted inferences, unreasonable conclusions, or arguments'" or "'that contradict matters properly subject to judicial notice or by exhibit'") (quoting Blankenship v. Manchin, 471 F.3d 523, 529 (4th Cir. 2006)).

III.

A.

Defendants argue that NAA's allegations that Defendants breached their contracts when they failed to pay NAA debts owed are conclusory and that, even if sufficiently alleged, any debts owed have been discharged in bankruptcy. Discharge of debt in bankruptcy was among the list of affirmative defenses in Rule 8(c)(1) of the Federal Rules of Civil Procedure until it was deleted, effective December 1, 2010. Fed. R. Civ. P. 8(c)(1) advisory committee's note to 2010 amendment. According to the advisory committee's note, describing discharge as an affirmative defense was confusing because, under 11 U.S.C. § 524(a), a discharge operates like an injunction against an action to collect a discharged debt. Id.

6

Nevertheless, Defendants' assertion that their debts have been discharged in bankruptcy is akin to asserting an affirmative defense. However, because a motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint, it generally "cannot reach the merits of an affirmative defense." Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007). An affirmative defense will be reached on a motion to dismiss in the "relatively rare circumstances" when "all facts necessary to the affirmative defense 'clearly appear[] on the face of the complaint.'" Id. (quoting Richmond, Fredericksburg & Potomac R.R. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993)). Here, there are no facts whatsoever on the face of the Amended Complaint concerning Defendants' bankruptcy. Therefore, it is not appropriate to address Defendants' defense of discharge at this stage.

Defendants also challenge as conclusory NAA's allegations that Defendants allegedly have failed to pay debts other than Ms. Phelps' obligation under her Promissory Note. However, NAA alleges that, according to the terms of Defendants' Agent Agreements, Defendants guaranteed their down-line agents' payment obligations, known as "roll-up expenses[,]" and cites to paragraph 2.f. of the Agent Agreements attached to the Amended Complaint. (Am. Compl. ¶ 10.) NAA further alleges that after the termination of the parties' relationships, Defendants were still

required to pay all debts owed. (Id. ¶ 12.)  It alleges that both Defendants breached their Agent Agreements by failing to pay debts owed to NAA, the amounts of which will be determined at trial, which "include amounts owed by B. Phelps under her Promissory Note . . . as well as debt resulting from roll up expenses." (Id. ¶ 30.)

According to NAA's allegations, it is seeking to collect both Ms. Phelps' obligation under her Promissory Note and Defendants' roll-up expenses, which it has alleged are down-line agents' payment obligations. Paragraph 2.f. of the Agent Agreements is entitled "Guarantee of Down-line Agents Debts to NAA and its Affiliates." (E.g., Am. Compl. Ex. C (Mr. Phelps' October 2013 Agent Agreement), Ex. L (Ms. Phelps' February 2014 Agent Agreement).)  According to that provision, Defendants agreed to pay all override charges for leads that their down-line agents failed to pay and other obligations of payment to NAA that Defendants' down-line agents may accrue.  Although not as detailed as other allegations in the Amended Complaint, the allegations that Defendants failed to pay NAA roll-up expenses as required in their Agent Agreements are not conclusory and, thus, are sufficient to survive Defendants' Motion to Dismiss.

8

B.

Defendants also argue that NAA's allegation that Ms. Phelps breached her contracts when she violated their non-compete provisions fails because the non-compete provisions are unenforceable as a matter of law. Defendants specifically argue that "the non-compete provision that Plaintiff attempts to enforce – found in paragraph nine of Exhibits J and K to the Amended Complaint [Ms. Phelps' Management Marketing Agreements of 2012 and 2013] – is unreasonable on its face as to its term, scope, and territory, and does not protect a legitimate business interest . . . ." [Doc. #28 at 7.] Defendants argue that "the duration of the non-compete is incomprehensible[,]" that the prohibition of sales of life insurance to anyone in the territory is too indefinite, that the territory is too expansive, and that NAA has no customers and, thus, no legitimate business interest. [Id. 8-10.]

Although covenants not to compete are not viewed favorably in North Carolina,[3] Hartman v. W.H. Odell & Assocs., Inc., 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994), they are enforced if "they are (1) in writing; (2) made part of a contract of employment;[4] (3) based on valuable

_____

[3] The contracts at issue provide that North Carolina law governs their interpretation. (See Am. Compl. Exs. J ¶ 13, K ¶ 13.)

[4] Covenants not to compete are also recognized in independent contractor relationships, as here. See, e.g., Mkt. Am., Inc. v. Christman-Orth, 135 N.C. App. 143, 154, 520 S.E.2d 570, 578 (1999) (noting that, although

9

consideration; (4) reasonable both as to time and territory; and (5) not against public policy," United Labs., Inc. v. Kuykendall, 322 N.C. 643, 649-50, 370 S.E.2d 375, 380 (1988). A covenant is not against public policy if it protects a legitimate business interest. Id. at 650, 370 S.E.2d at 380. Therefore, to be valid, a restrictive covenant "must be no wider in scope than is necessary to protect the business of the employer." VisionAIR, Inc. v. James, 167 N.C. App. 504, 509, 606 S.E.2d 359, 362 (2004).

First, despite Defendants' protestations otherwise, NAA has sufficiently alleged a protectable legitimate business interest. "[P]rotection of customer relationships and good will against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer." United Labs., Inc., 322 N.C. at 651, 370 S.E.2d at 381. This is especially true when "the employee is the sole or primary contact between the customer and the employer." Id., 370 S.E.2d at 381. In other words,

> a covenant is reasonably necessary for the protection of a
> legitimate business interest "if the nature of the employment is
> such as will bring the employee in personal contact with patrons
> or customers of the employer, or enable him to acquire valuable

---

defendant argued that the covenant was void because she was an independent contractor and not an employee, the North Carolina Court of Appeals has held that non-compete clauses are applicable to independent contractors).

information as to the nature and character of the business and the names and requirements of the patrons of customers."

Okuma Am. Corp. v. Bowers, 181 N.C. App. 85, 90, 638 S.E.2d 617, 621 (2007) (quoting United Labs., Inc., 322 N.C. at 650, 370 S.E.2d at 380).

According to the allegations in the Amended Complaint and the terms of Ms. Phelps' Management Marketing Agreements, Ms. Phelps had access to or knowledge of confidential information regarding NAA's business activities, which included, among other things, pricing methods, customer lists, leads lists, potential customers lists, and customer contact information for NAA customers. (Am. Compl. ¶¶ 15, 26-27, Exs. J ¶ 1, K ¶ 1.)  The Agreements repeatedly refer to NAA customers. (See, e.g., Am. Compl. Ex. K ¶ 1 ("Company's . . . customer lists, . . . leads lists, potential customers lists and lists of customer contact information for customers of the Company[.]"), ¶ 6 (prohibiting solicitation of "customers of the Company").) By way of her agreements with NAA, Ms. Phelps served as an independent contractor selling life insurance products to customers for whom Ms. Phelps was the primary point of contact.  It is clear from the Amended Complaint and its attached agreements that Ms. Phelps, as the primary, if not the sole, point of contact between the customers and NAA, had access to confidential information, including current and prospective customer information.  Therefore, NAA had a legitimate business interest to protect.

11

Whether or not the time, territory, and scope of the covenant are reasonable is less evident from the face of the Amended Complaint or the terms of the Management Marketing Agreements at issue. North Carolina courts recognize five years as the "outer boundary" of a reasonable time restriction. Farr Assocs., Inc. v. Baskin, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000). When a covenant's time restriction includes a look-back provision restricting solicitation of individuals who were the employer's customers during some period in the past, that look-back period is included to determine the scope of the time restriction. Id., 530 S.E.2d at 881. Compare id. at 278, 281, 530 S.E.2d at 880, 881-82 (adding two years to the three-year non-solicitation restriction because the covenant prohibited solicitation of "any client or customer who was a client or customer of the Company during the two (2) year period immediately preceding the termination date of the Employee's employment with the Company") with Wachovia Ins. Servs., Inc. v. McGuirt, No. 06CVS13593, 2006 WL 3720430, at *10 (N.C. Special Super. Ct. Dec. 19, 2006) (Diaz, J.) (unpublished) (finding no look-back period when the covenant was "tailored to capture only those clients whom McGuirt worked with during the two years preceding his termination").

12

Here, the term of Ms. Phelps' restriction in paragraph 9 of her Marketing Management Agreements is not as incomprehensible as Defendants argue. Ms. Phelps is restricted for two years "in regards to any insurance company with whom the Company has served as IMO during the twelve (12) months immediately prior to the termination of services[.]" (Am. Compl. Exs. J ¶ 9, K ¶ 9.) She is restricted for one year "in regards to any insurance company with whom the Company has not served as IMO during the twelve (12) months immediately prior to the termination of services[.]" (Id.) In other words, Ms. Phelps is restricted from certain activities for a period of two years if those activities involve an insurance company for whom NAA has served as an IMO and for a period of one year if those activities do not involve such an insurance company. Those time periods are within reason.

Defendants argue that the phrase "[d]uring the term of this Agreement" constitutes a look-back provision and adds some period of time to the restriction. [See Doc. #28 at 9.] However, that phrase does not constitute a look-back provision. In Farr Assocs., Inc., the non-compete agreement also included the very same phrase, but that phrase did not trigger the court's inquiry into the inclusion of a look-back period or constitute part of the look-back period. 138 N.C. App. at 277, 281, 530

13

S.E.2d at 880, 881-82 (quoting as part of covenant, "the Employee covenants and agrees that during the term of this Agreement and for a period of three (3) years from the date the Employee's employment with the Company is terminated" the employee will not render services to any current customer of the Company "or to any client or customer who was a client or customer of the Company during the two (2) year period immediately preceding the termination date of the Employee's employment").

It is not enough, though, that the time restriction appears reasonable. "Although a valid covenant not to compete must be reasonable as to both time and area, these two requirements are not independent and unrelated aspects of the restraint. Each must be considered in determining the reasonableness of the other." Jewel Box Stores Corp. v. Morrow, 272 N.C. 659, 665, 158 S.E.2d 840, 844 (1968). Because a "primary purpose[] of a covenant not to compete is to protect the relationship between an employer and its customers[,] . . . an employer must first show where its customers are located . . . ." Hartman, 117 N.C. App. at 312, 450 S.E.2d at 917. "A restriction as to territory is reasonable only to the extent it protects the legitimate interest of the employer in maintaining [its] customers." Id., 450 S.E.2d at 917. "Where the alleged primary concern is the employee's knowledge of the customers, the territory should only be limited to areas in

14

which the employee made contacts during the period of his employment."

Id. at 313, 450 S.E.2d at 917.

With these important constraints in mind, six factors guide a court's consideration of the reasonableness of the geographic scope of a covenant:

> (1) the area, or scope, of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked or was subject to work; (4) the area in which the employer operated; (5) the nature of the business involved; and (6) the nature of the employee's duty and his knowledge of the employer's business operation.

Id. at 312, 450 S.E.2d at 917.

Here, Ms. Phelps is restricted from engaging in "a Competing Business," which is defined as "any life insurance business consisting of Life Insurance Products that is the same or substantially similar to that which is transacted by the Company[,]" within the Territory. (Am. Compl. Exs. J ¶ 9, K ¶ 9.) The Territory is defined as North Carolina, Virginia, and "any state in which [Ms. Phelps or one of her agents, independent contractors, or affiliates] regularly carried on the business of providing services for Company." (Id.) If Ms. Phelps did not regularly carry on business in a particular state, the Territory was defined as "within fifty (50) miles of any area in such state in which [she] conducted business" according to the Agreement. (Id.) The same is true for her agents, independent contractors, or affiliates. (Id.) She is also prohibited from performing "services for a

15

customer or Competing Business within the Territory which are the same as or similar to those which [she] provided while engaged by the company. (Id.)

Defendants argue that these prohibitions are too broad and indefinite to be enforceable, and perhaps they are. But, the required analysis cannot be conducted at this stage. The extent of the necessary information before the Court includes NAA's allegations that it is a Virginia corporation with its principal place of business in North Carolina, that it is an IMO and MGA to various insurance companies and recruits independent contractors to sell insurance for those companies, that Ms. Phelps was a resident of Texas at the time NAA filed the Amended Complaint, and that Ms. Phelps continued to contact and solicit sales to NAA customers after NAA terminated its relationship with her. (Am. Compl. ¶¶ 1, 2, 4, 5, 13-17.) But, there are no allegations as to the location of NAA's customers whom it alleges Ms. Phelps unlawfully contacted, the geographic area assigned to Ms. Phelps, the area in which she actually worked, or the area in which NAA operated. The Management Marketing Agreements also offer no guidance, other than reflecting that Ms. Phelps was a resident of Texas at the time she executed the agreements. (Am. Compl. Exs. J, K.) Other agreements attached to the Amended Complaint add little more than that Michigan was Ms. Phelps' state of residence for a period of time. (See, e.g., Am. Comp. Ex. F.) Ms.

16

Phelps' Agent Agreements refer to a Lead Purchase Program according to which Ms. Phelps could request leads "in the geographical area(s) described in any geographical mailing request ("GMR") which shall be a part of this Agreement." (See, e.g., Am. Compl. Ex. L ¶ 2.a.) However, no such GMR was attached to the Amended Complaint.

Although the reasonableness of a restrictive covenant is a matter of law for the court to decide, Hartman, 117 N.C. App. at 311, 450 S.E.2d at 916, at this stage, the enforceability of Ms. Phelps' covenant not to compete turns on factual questions for which there are not answers before the Court. Taking the facts in the light most favorable to NAA, it has stated a claim against Ms. Phelps for breach of her covenant not to compete for which relief might be granted. See Okuma Am. Corp., 181 N.C. App. at 92, 638 S.E.2d at 622 (holding at the 12(b)(6) stage that the plaintiff's complaint, when taken as true, stated a claim for relief which might be granted even though "the enforceability of the covenant . . . rests on factual questions such as whether the geographic effect of the client-based restriction is excessive in light of [the defendant's] actual contacts with customers, the nature of his duties, the level of his responsibilities, the scope of his knowledge, and other issues relating to how closely the geographic limits fit with [his] work for [the plaintiff]"); ACS Partners, LLC,

17

2010 WL 883663, at *7 (finding the same).  Therefore, as to NAA's claim

that Ms. Phelps breached her covenant not to compete, Defendant's Motion

to Dismiss is denied.

IV.

Defendants also challenge NAA's claim of tortious interference with

business relations because NAA has not alleged the existence of a contract

between NAA and a third party.  In the alternative, Defendants argue that

the economic loss doctrine bars this claim because it is based on the same

conduct as NAA's claims for breach of contract.

Although alleged as a single claim entitled "Tortious Interference with

Business Relations," per NAA's allegations, the third claim is actually two

distinct claims – one for tortious interference with current business relations

and one for tortious interference with prospective business relations. (See

Am. Compl. ¶ 50 ("The foregoing conduct constitutes tortious interference

with NAA's current and prospective business relations.").)  North Carolina[5]

---

[5] The allegations in the Amended Complaint are not sufficiently detailed to
determine which state's substantive law should apply to NAA's tortious
interference claims and UDTPA claim.  NAA allegedly has its principal place
of business in North Carolina (Am. Compl. ¶ 1), Defendants were residents
of Texas at the time the Amended Complaint was filed (id. ¶ 2), Ms. Phelps
was a resident of Michigan at some point during her contract with NAA
(e.g., id. Ex. F, G, H), and neither the allegations nor the attached
agreements at issue identify the geographic location of solicited customers.
However, the parties seem to agree that North Carolina law governs the

18

case law refers to tortious interference with business relations and tortious interference with contracts somewhat interchangeably and imprecisely. Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C., No. 00-CVS-10358, 2002 WL 31002955, at *10 (N.C. Special Super. Ct. July 10, 2002) (Tennille, J.) (unpublished) (acknowledging confusion due to the "courts' varying degree of precision in framing tortious interference issues" and noting that "[t]he nomenclature of broad categories and specific causes of action have sometimes been used interchangeably"). Nevertheless, under North Carolina law, claims for tortious interference with business relations and prospective business relations are understood to be claims for tortious interference with contract and prospective contract, respectively. As Judge Tennille explained, the court in Owens v. Pepsi Cola Bottling Co., 330 N.C. 666, 412 S.E.2d 636 (1992), "used the broader category of 'business relationships' to encompass the twin components of tortious interference: interference with contract and interference with prospective contract or prospective economic advantage." Sunbelt Rentals, Inc., 2002 WL 31002955, at *10.

---

Court's analysis of NAA's claims based in tort. Although no party addresses the issue of which state's law applies, all parties cite to and rely on North Carolina law in their briefs in support of and in opposition to, respectively, Defendants' Motion to Dismiss. [See Docs. #24, 25, 28.]

19

A plaintiff may assert a claim for tortious interference with current business relations "when a defendant induces a third party to not perform an existing contract with the plaintiff." Sports Quest, Inc. v. Dale Earnhardt, Inc., Nos. 02CVS0140, 01CVS220, 2004 WL 742918, at *5 (N.C. Special Super. Ct. Mar. 12, 2004) (unpublished).  To state a claim for tortious interference with current business relations, a plaintiff must allege facts that show:

> (1) a valid contract between the plaintiff and a third party which confers upon the plaintiff a contractual right against a third party; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to [the] plaintiff.

United Labs., Inc., 322 N.C. at 661, 370 S.E.2d at 387.

Here, NAA has not alleged the existence of a contract between it and a third party.  The only contracts to which NAA alleges it was a party are the contracts between NAA and Mr. Phelps and between NAA and Ms. Phelps. (See Am. Compl. ¶¶ 7, 8.)  NAA alleges that it had customers, but only that it had relationships, not contracts, with those customers. (See, e.g., ¶ 23.)  Even in its response in opposition to Defendants' Motion, NAA does not argue that it sufficiently alleged a valid contract between itself and a third party. [Doc. #25 at 7-9.]  Instead, it refers to its "relationships" with its customers, which is insufficient under North Carolina law. [Id.] See

20

Sports Quest, Inc., 2004 WL 742918, at *6 (describing the fact that the plaintiff's business "relationships" with some third parties did not include contracts as a "fatal flaw[]" to the plaintiff's claim of tortious interference with current business relations as to those third parties). Because NAA has not sufficiently alleged the first element of this claim, it is unnecessary to evaluate the sufficiency of the allegations in support of the remaining elements or whether or not the economic loss doctrine bars this claim.

When a defendant's actions "prevent[] the making of contracts" with a third party, a plaintiff may assert a claim for tortious interference with prospective economic advantage. Owens, 330 N.C. at 680, 412 S.E.2d at 644. To state a claim for tortious interference with prospective business relations, a plaintiff "must allege facts to show that the defendants acted without justification in 'inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference'" and that the defendants' conduct proximately caused "measurable damages[.]" Walker v. Sloan, 137 N.C. App. 387, 393, 394, 529 S.E.2d 236, 242 (2000) (quoting Cameron v. New Hanover Mem'l Hosp., 58 N.C. App. 414, 440, 293 S.E.2d 901, 917 (1982)). A plaintiff "must allege actual loss" of a "prospective contractual relationship, . . . a fundamental element of a tortious interference claim." AECOM Tech. Corp.

v. Keating, No. , 2012 WL 370296, at *5 (N.C. Special Super. Ct. Feb. 6, 2012) (unpublished) (citing Dalton v. Camp, 353 N.C. 647, 654, 548 S.E.2d 704, 709-10 (2001)); see also DaimlerChrysler Corp. v. Kirkhart, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002) (finding that the plaintiff failed to establish a likelihood of success on the merits of its tortious interference with prospective advantage claim when it "failed to identify any particular contract that a third party has been induced to refrain from entering into" with the plaintiff).  It is not enough to allege that the plaintiff had "an expectation of a continuing business relationship" with a third party. Dalton, 353 N.C. at 655, 548 S.E.2d at 710; see also Sports Quest, Inc., 2004 WL 742918, at *5 (stating that the plaintiff's "expectation of future contracts with current customers" is insufficient).

Here, NAA has failed to allege facts showing that Defendants induced a third-party not to enter into a contract with NAA that would have ensued but for Defendants' actions.  NAA alleges that it "has a reasonable expectation that existing customers will continue to be customers of NAA" and that those "customers will purchase additional products from NAA." (Am. Compl. ¶ 18.)  These allegations are insufficient, because NAA has not alleged that those customers would have entered into contracts with NAA but for Defendants' actions.  As above, because NAA has not sufficiently

22

pled the loss of a prospective contract, it is unnecessary to analyze the sufficiency of the allegations in support of the other elements or whether or not the economic loss doctrine bars this claim.

In sum, NAA has failed to state a claim for tortious interference with current or prospective business relations. Therefore, Defendants' Motion is granted as to the Amended Complaint's third claim.

V.

Finally, Defendants argue that the economic loss doctrine bars NAA's claim of unfair and deceptive trade practices because NAA's allegations in support of this claim are not distinct from the allegations in support of the breach of contract claims. Unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce are prohibited. N.C. Gen. Stat. § 75-1.1 ("UDTPA"). To state a claim for unfair or deceptive trade practices, a plaintiff must allege that "(1) the defendants committed an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff[] or to the plaintiff['s] business." Walker, 137 N.C. App. at 395, 529 S.E.2d at 243. An unfair practice is one that "offends established public policy" or "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers." Id., 529 S.E.2d at 243. A deceptive

23

practice is one that "has the capacity or tendency to deceive the average consumer[.]" Spartan Leasing, Inc. v. Pollard, 101 N.C. App. 450, 461, 400 S.E.2d 476, 482 (1991).

As the Fourth Circuit has explained, "North Carolina courts have repeatedly held that 'a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [the UTPA,] N.C.G.S. § 75-1.1.'" Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 347 (1998) (quoting Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992)).  Instead, a plaintiff must show "substantial aggravating circumstances" to recover under the UDTPA. Branch Banking & Trust Co., 107 N.C. App. at 62, 418 S.E.2d at 700.

Here, the heart of most of NAA's allegations against Defendants is undoubtedly a claim for breach of contract. (See Am. Compl. ¶¶ 10-12, 15.a.-15d., 24-31.)  However, unlike Broussard or Superior Performers, Inc. v. Meaike, No. 1:13CV1149, 2014 WL 5819826 (M.D.N.C. Nov. 10, 2014) upon which Defendants rely, NAA's allegations are not limited to solicitation of customers in violation of various agreements.  NAA alleges that

> Defendants have contacted individuals who were at the time of
> the contact NAA's current customers and made false
> representations about Defendants' status and about NAA.
> Defendants falsely informed these NAA customers (1) that

> Defendants were still the customers' agents, (2) that Defendants were still NAA agents, and (3) that if another NAA agent attempted to contact them, it was a scam.

(Am. Compl. ¶ 16.) NAA then alleges that "Defendants contacted and made some combination of the above false statements to at least" thirteen specific individuals identified in the Amended Complaint. (Id. ¶ 17.a.-m.)

In Broussard, the issues entirely revolved around a contract dispute over the defendants' authority to pay over amounts from a particular account for advertising. 155 F.3d at 335, 345-47. The contracts specified the terms for advertising and its payment, terms over which the parties disagreed. Id. at 345-46. Because this was a "straightforward contract dispute," plaintiffs' claims for violations of UDTPA were "out of place." Id. at 345, 347.

Defendants emphasize too greatly the significance to this case of the court's opinion in Superior Performers, Inc. In Superior Performers, Inc., NAA sued its former agents and managers for similar claims as it has asserted against Defendants. 2014 WL 5819826, at *1. In its proposed amended complaint, NAA alleged that the defendants violated the non-solicitation of employees and independent contractors provision of their contracts. Id. at *3. The defendants purportedly solicited NAA agents to discontinue their relationships with NAA and establish business relationships

25

with the defendants. Id. at *5. In addition to alleging breach of contract,

NAA alleged that the defendants violated the UDTPA. Id. at *7. The bases

of the UDTPA claim was the defendants' alleged intentional interference

with contracts between NAA and its agents and wrongful establishment of

business relationships with these agents. Id. at *8. The court found that

NAA's claim for a violation of UDTPA was not distinct from its breach of

contract allegations, both of which arose from the defendants' alleged

violation of the non-solicitation agreements. Id. at *9. NAA "did not allege

any substantial aggravating circumstances apart from the mere breaches of

the covenants[] that would allow the claim that ultimately arises from a

breach of contract[] to proceed under the UDTPA." Id. Therefore, the court

found that allowing the UDTPA claim to proceed was futile and denied

NAA's motion to amend as to this claim. Id.

Similarly, in ACS Partners, LLC v. American Group, Inc., No.

3:09CV464-RJC-DSC, 2010 WL 883663, at *3 (W.D.N.C. Mar. 5, 2010),

the plaintiff alleged that its former employee solicited its customers and used

its pricing scheme in violation of his agreements with the plaintiff. These

breach of contract claims were the sole bases for the plaintiff's UDTPA

claim against its former employee, allegations that did "not point to the sort

of 'substantial aggravating circumstances' that are necessary to support a

26

claim under the UDTPA." Id. at *9.  The court granted the individual

defendant's motion to dismiss the UDTPA claim. Id. at *1.

At this stage, at least, this case is different.  NAA did not simply

allege that Defendants solicited customers and used confidential information

to do so in breach of their contracts.  NAA also alleged that Defendants told

at least thirteen named customers that Defendants were still their agents,

that Defendants were still NAA agents, and that if another NAA agent

contacted the customers, it was a scam.  At this stage, these allegations

show sufficiently substantial aggravating circumstances beyond mere

solicitation of customers or competition in violation of contracts.

Furthermore, although Defendants argue that NAA's purported injury is

speculative, NAA has sufficiently alleged that Defendants' violation of the

UDTPA injured NAA.  NAA alleged that Defendants told at least the thirteen

customers identified in the Amended Complaint that Defendants were the

customers' agents, were NAA agents, and that if another NAA agent

contacted them, it was a scam. (Am. Compl. ¶¶ 16, 17.)  NAA alleged upon

information and belief that Defendants made these statements to other NAA

customers. (Id. ¶ 17.)  "As a result of Defendants' actions, numerous NAA

customers have terminated their relationships with NAA and its carriers."

(Id. ¶ 23.)  NAA's allegations of damages and substantial aggravating

27

circumstances are sufficient to withstand Defendants' Motion to Dismiss the fourth claim.

VI.

For the reasons stated herein, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss is GRANTED as to the third claim (tortious interference with business relations) and DENIED as to the first, second, and fourth claims.

This the 5th day of January, 2016.


/s/ N. Carlton Tilley, Jr.<br>Senior United States District Judge